# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black Apple iPhone<br>IMEI No. 354915096052494 | Case No. '22 MJ4122 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-1, incorporated herein by reference.

located in the __Southern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21, USC sec. 841/846 | Possession with the intent to distribute Methamphetamine and Conspiracy to do the same. |

The application is based on these facts:
See Attached Affidavit of DEA Special Agent Kyle Crew, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*SA Kyle Crewe*
Applicant's signature

Special Agent Kyle Crewe, DEA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__telephone__ *(specify reliable electronic means)*.

Date: 11/09/2022

Judge's signature

City and state: San Diego, California      Hon. Michael S. Berg, U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT

I, Kyle Crewe, Special Agent, Drug Enforcement Administration, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices, (collectively, the "Target Devices"):

> **Target Device 1**:
> Black Apple iPhone
> IMEI No. 354915096052494
> Used by Estella ORTIZ
> As set forth in Attachment A-1
>
> **Target Device 2**:
> Blue Samsung Phone
> IMEI No. 3584851413417
> Used by Tatiana VEGA
> As set forth in Attachment A-2
>
> **Target Device 3**:
> Pink Samsung Phone
> IMEI No. 353819350969867
> ("Target Device 3")
> Used by Veronica VASQUEZ
> As set forth in Attachment A-2
>
> **Target Device 4**:
> Pink Samsung Phone
> IMEI No. 356004110324714
> ("Target Device 4")
> Used by Julio RODRIGUEZ
> As set forth in Attachment A-4

As described in attachments A-1, A-2, A-3 and A-4, to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841 and 846 as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Julio Marco Rodriguez, Veronica Vazquez-Loaeza, Tatiana Vega and Estela Ortiz ("Defendants") for importing/housing approximately 912.6 kilograms (2012.1

pounds) of Methamphetamine from Mexico into the United States. **Target Devices 1 through 4** are in DEA custody at 2055 Sanyo Ave. San Diego, California. Information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Target Devices, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

2.  I, Kyle Crewe, being duly sworn, declare and state: I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7) that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.  I have been employed by the United States Department of Justice, Drug Enforcement Administration ("DEA"), as a Special Agent and have been so employed since May 2021. Prior to DEA I was a uniformed police officer in the State of Massachusetts since 2015. I am presently assigned to the San Ysidro Resident Office of the San Diego Field Division in California. During the course of my employment as a DEA Special Agent, I have participated in narcotics investigations either as a case agent or in a supporting role. I have debriefed defendants, confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking organizations. In addition, I have discussed the methods and practices used by narcotics traffickers with numerous law enforcement officers and confidential sources. I have also participated in many aspects of drug investigations, including but not limited to, undercover or confidential source buy

operations, telephone toll analysis, records research, physical and electronic surveillance activities, and wiretap investigations.

4. Through my training and experience, and my conversations with other agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of mobile telephones, and their use of codes and code words to conduct their activities. I have become familiar with the manner in which controlled substances are packaged, marketed and consumed. I am familiar with the ordinary meaning of controlled substance slang and jargon and also with the manners and techniques of drug traffickers as practiced locally. Also, I have become familiar with narcotics traffickers' methods of operation, including but not limited to the manufacturing, distribution, storage, and transportation of narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

5. In preparing this affidavit, I have also conferred with other agents and law enforcement personnel who are experienced in the area of narcotics smuggling investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the facts below, or have had them related to me by persons mentioned in this affidavit.

6. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics, such as cocaine, heroin, and methamphetamine. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic

contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances. Narcotics smugglers and their organizations use cellular telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular telephones.

7. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug traffickers, including stash house operators, will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug traffickers, including stash house operators, will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug traffickers, including stash house operators, and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d. Drug traffickers, including stash house operators, will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e. Drug traffickers, including stash house operators, will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f. Drug traffickers, including stash house operators, and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

    g. The use of cellular/mobile telephones by drug traffickers, including stash house operators, tends to generate evidence that is stored on the cellular/mobile telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

10. Subscriber Identity Module ("SIM") Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

11. Based upon my training and experience as a DEA Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned, based upon my training, education, and experience that searches of cellular/mobile telephones associated with narcotics smuggling investigations yield evidence:

   a. tending to identify attempts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

   d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled

    substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

12. At approximately 12:56 PM on May 12, 2022, a U.S. Border Patrol Agent conducting surveillance near the Otay Mesa, Port of Entry (POE) observed a box truck exit the POE and pull over onto Roll Drive, which is less than a mile from the POE.

13. The agent saw the driver get out of the truck and walk back into Mexico. Agents also saw a different man get into the truck and drive it to a residence located at 748 41st Street, San Diego, California. The truck backed into the driveway and agents observed



four males unload 39 cardboard boxes from the truck and carry them into the residence.[1]

14. Agents watched the residence for the next several hours. At approximately 5:45 PM, agents observed two females, later identified as Tatiana VEGA and Estela ORTIZ, pull up to the residence in a black VW Passatt. VEGA and ORTIZ stood near the curb a short distance from the residence while a man drove the Passat into the driveway of the residence at 748 41st Street and took five large moving boxes out of the house and loaded them into the trunk and rear seat of the Passat. The man then drove the vehicle approximately ½ block back to VEGA and ORTIZ and VEGA and ORTIZ drove away.

15. A Deputy with the San Diego County Sheriff's Office followed the vehicle and pulled it over for a traffic violation. VEGA and ORTIZ both provided consent to search the vehicle. The deputy deployed a drug detection dog to the vehicle. The dog alerted to the vehicle and the SDSO deputy found approximately 260 pounds of methamphetamine in the boxes stored in the vehicle's trunk and rear seat. The boxes contained a crystalline substance that field tested positive for Methamphetamine.

16. At the time of their arrest VEGA and ORTIZ each possessed a cellular phone. ORTIZ possessed **Target Device 1**. A Sherriff Deputy observed ORTIZ trying to text on **Target Device 1** during the traffic stop. VEGA possessed **Target Device 2**, which was located in her purse and which she identified as her own.

---

[1] Agents later verified the number of boxes unloaded from the truck by watching the video and counting the boxes as they went into the residence.



17. A few minutes after the PASSAT traffic stop, Investigators observed Julio RODRIGUEZ and Veronica VAZQUEZ, who reside at 748 41st Street, leave the house in a pickup truck. They were traffic stopped about half a block away from the house and detained. Sergeant William Kerr spoke with RODRIGUEZ, who gave consent to search the residence at 748 41st Street. RODRIGUEZ told Sgt Kerr they had been renting the



house for about 3 years and later signed a consent to search form. Sgt. Kerr and other investigators went back to the house with RODRIGUEZ who agreed to let Sergeant Kerr open one of the boxes in the house. A single box was opened, and Sgt. Kerr located a large bundle of suspected narcotics in the form of a white crystalline substance that later tested positive for methamphetamine. The box contained large Tupperware containers wrapped in brown packing tape. RODRIGUEZ agreed to let investigators check the remaining boxes. Investigators found a total 34 additional boxes containing approximately 1,512 net pounds of methamphetamine that was packaged for transportation and sales inside the main living area of the residence. Each box was labeled with the weight of the narcotics inside.

18.   The 34 large boxes occupied the vast majority of space in the main living room of the house. From that fact I draw several inferences. Because officers observed the boxes being loaded into the house before RODRIGUEZ and VAZQUEZ left the house, but did not observe RODRIGUEZ and VAZQUEZ enter the house at any time, RODRIGUEZ and VAZQUEZ would have been present in the house during the entire time the 39 boxes were being unloaded from the truck and loaded into the house. Also, since those 39 boxes took up a substantial amount of the living space in that modestly sized house, RODRIGUEZ and VAZQUEZ would have both had agree to sacrifice their available living space to accommodate so many large boxes. They would also have been present hours later when the man removed five boxes from the house and loaded them into the Passat, allowing that man access to the house and the boxes it contained. The active loading and unloading of boxes from the house would require the consent and participation of all its residents, at a minimum they would have to adjust their movement within the house to accommodate the transfer of the boxes within their home. Further, RODRIGUEZ and VAZQUEZ both left the house within minutes of when methamphetamine was discovered

in the PASSAT, supporting an inference that they were in communication with another member of the organization who alerted them to the seizure. Finally, the 1,512 net pounds of methamphetamine stored in their residence had a value of well over $1.5 million. Whoever owned and controlled that amount of methamphetamine would not trust it to someone who did not know what the boxes contained so as to take precautions to guard the residence from law enforcement and ordinary visits from neighbors and passerby.

19. On approximately August 31, 2022, I spoke with a Source of Information (SOI) who had personal knowledge of the residence at 748 41st Street and its use as a stash house for prior narcotics trafficking loads. The SOI informed me that the residence at 748 41st Street had been used to store narcotics on one or more occasions prior to May 12, 2022, and that RODRIGUEZ was present at the residence during such prior deliveries (although the SOI could provide no information that VAZQUEZ was present during such deliveries).

19. **Target Devices 3 and 4** were found on the front seat of the cab of the pickup truck that RODRIGUEZ and VASQUEZ were driving. Detective Jake Sanchez asked each RODRIGUEZ and VAZQUEZ who the phones belonged to and VAZQUEZ identified **Target Device 3** as her phone and RODRIGUEZ identified **Target Device 4** as his phone. IMEI number 353819350969867 is printed on the back of **Target Device 3**, and IMEI number 356004110324714 is printed on the back of **Target Device 4**.

20. With RODRIGUEZ's consent, investigators took photographs of call logs in **TARGET Device 4**. Phone number, 619 398 5937 (the "5937 number") was listed in the call log with the contact name, "Rodriguez Julio." A database search revealed that service to the 5937 number is provided by AT&T. Agents issued administrative subpoenas to AT&T requesting subscriber information for the 5937 number. AT&T records indicate that the number was activated on August 24, 2020, by "Julio Marco Julio Rodriguez Inc." with

an address listed at 748 41st St., San Diego, CA, and a prior address listed at 3735 T Street, San Diego, CA.

21. Agents searched a commercial database for phones associated with "Veronica Vasquez" and found that phone number 619 572 9135 (the "9135 number") is associated with that name, and the address 3735 T Street, San Diego, CA, which is the same prior address listed for RODRIGUEZ. The 9135 number is also saved in **Target Device 4** (the phone used by RODRIGUEZ) under the contact name "B" (in Spanish, "B" and "V" are pronounced the same). Since the 9135 number is associated with VASQUEZ, and since VASQUEZ identified **Target Device 3** as her phone, after investigators found it on the front seat of the pickup truck in which she was a passenger, there is probable cause to believe that the 9135 number is associated with **Target Device 3**. A law enforcement database indicates that service to that number is provided by AT&T. Agents served a subpoena on AT&T and learned that the 9135 number is subscribed to "Julio Marco Julio Rodriguez Inc.," with the same activation date as **Target Device 4**: Further, both the 5937 number and the 9135 number share the same account number.

22. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the Target Devices. In light of the above facts and my experience and training, there is probable cause to believe that RODRIGUEZ and VAZQUEZ were using the Target Devices to communicate with others to further the distribution of illicit narcotics within the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a

drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as the RODRIGUEZ, VASQUEZ, VEGA, and ORTIZ, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Based upon my training and experience I also know that stash house operators and couriers almost never own the drugs they are trafficking. Instead, a narcotics trafficking organization owns the drugs and assigns drug loads to stash house operators and couriers when their services are needed. Traffickers who are relatively new to working with such an organization are initially trusted with narcotic loads that are less valuable than more experienced traffickers. As a drug trafficker gains experience, they are entrusted with increasingly more valuable loads. Based on the enormous quantity of methamphetamine seized during this operation, and the exceedingly high value of the drugs entrusted to them, I believe that RODRIGUEZ and VASQUEZ have been working with the narcotics trafficking organization that owned these drugs for a long time.  The organization that owned those drugs would not have used a novice stash house operator for a load that large. Moreover, **Target Devices 3 and 4**, both subscribed to by RODRIGUEZ, have been active since Summer 2020. Accordingly, I request permission to search Target Devices 3 and 4 for data beginning on May 12, 2021, up to and including May 12, 2022, and I request permission to search Target Devices 1 and 2 for data beginning on March 12, 2022, up to and including May 12, 2022.

//

//

## METHODOLOGY

23. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

24. Following the issuance of this warrant, I will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the telephone

and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

25. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

26. Law enforcement has made three prior attempts to obtain the evidence sought by this warrant. On May 12, 2022, law enforcement officers on the scene conducted a cursory search of the phones. On June 6, 2022, the San Diego Sherriff's Department obtained a warrant issued by the California Superior Court to search the phones and they used forensic software to download the phones. However, the software used was unable to capture certain third-party messenger applications, such as Facebook Messenger, Instagram, or WhatsApp. On July 29, 2022, the San Diego Sheriff's Office obtained an additional warrant issued by the California Superior Court to search the phones. This download relied on certain information that the government does not wish to rely on for a finding of probable cause, and omitted certain information that the government is now relying on to find probable cause. The government asks the Court to disregard these prior attempts in determining whether there is probable cause to support the requested warrants.

## CONCLUSION

27. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the Target Devices will yield evidence of the Defendant's violations of Title 21, United States Code, Sections 841 and 846. Accordingly, I request

that the Court issue a warrant authorizing law enforcement to search the items described in Attachments A-1, and A-2, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Kyle Crewe*
Kyle Crewe, Special Agent
Drug Enforcement Administration

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 9th day of November 2022.

Hon. Michael S. Berg
United States Magistrate Judge

# ATTACHMENT A-1

## PROPERTY TO BE SEARCHED

The following property is to be searched:

>**Target Device 1**:
>Black Apple iPhone
>IMEI No. 354915096052494
>Used by Estella ORTIZ
>As set forth in Attachment A-1

**Target Device 1** is currently in DEA custody at 2055 Sanyo Ave. San Diego, California

# ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period beginning on May 12, 2021, up to and including May 12, 2022, as to **Target Devices 3 and 4**, and for the period March 12, 222, up to and including May 12, 2022, as to **Target Devices 1 and 2**:

a. tending to indicate efforts to import controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.